UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE:<br><br>Worldwide Wholesale Lumber, Inc. d/b/a<br>Veracor Wood Products International,<br><br>Debtor. | C/A No. 06-01499-JW<br><br>**ORDER**<br><br>Chapter 7 |

FILED
at ___ o'clock & ___ min ___
FEB 1 2 2007
United States Bankruptcy Court
Columbia, South Carolina (sr)

ENTERED
FEB 1 2 2007
K.R.W.

This matter is before the Court upon the Motion of AGM II LLC for Allowance of Claim and to Compel Payment Thereof (the "Motion"). Michelle L. Vieira, as Chapter 7 Trustee (the "Trustee"), filed an objection to the Motion. This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O). After hearing the parties' arguments, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, which is made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[1]

## FINDINGS OF FACT

1. Worldwide Wholesale Lumber, Inc. d/b/a Veracor Wood Products International ("Debtor" or "Borrower") and AGM II LLC ("AGM" or "Administrative Agent"), in its capacity as administrative agent for Lancelot Investments, LLP ("Lancelot"), are parties to that certain Master Financing Agreement dated June 22, 2005 (as amended, restated, modified, or supplemented and in effect from time to time (the "Loan Agreement"), and together with such other agreements, instruments, notes and other documents executed in connection therewith, as amended, modified, or supplemented (collectively, the "Loan Documents").

2. Pursuant to the terms of the Loan Agreement, AGM has made loans to, and made other financial accommodations to or for the benefit of, Debtor.

---

[1] To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are also adopted as such.

3. The Loan Agreement is governed by the laws of the State of Illinois.

4. Debtor entered into and executed in favor of AGM, as Administrative Agent for Lancelot, a certain Security Agreement dated June 22, 2005 (as amended, restated, modified or supplemented, the "Security Agreement"). Pursuant to the Security Agreement, Debtor granted to AGM, for the benefit of AGM and Lancelot, a security interest in and lien on all of the tangible and intangible assets of Debtor, including inventory and the proceeds thereof, whether now or hereafter owned or acquired by Debtor (the "Collateral"), as security for the loan)

5. AGM perfected its security interest in the Collateral by filing a UCC financing statement with the Secretary of State of South Carolina two days prior to the execution of the Loan Agreement.

6. Pursuant to the conditions set forth in the Loan Agreement, AGM agreed to provide credit to Debtor. Credit was provided to Debtor pursuant to various purchase loans that would enable Debtor to purchase inventory. The loans were evidenced by a series of "Purchase Notes" executed by Debtor. The Purchase Notes bore interest at a non-default rate of approximately thirty (30%) percent per annum.

7. Once Debtor shipped the inventory to its customers, the Purchase Note covering the inventory would convert into an A/R Note. The A/R Notes bore interest at a non-default rate of approximately twelve (12%) percent per annum. Debtor's entry into an A/R Note was a condition precedent to AGM converting a Purchase Note into an A/R Note pursuant to Section 3.3 of the Loan Agreement.

8. Debtor would prepare borrowing based certificates and submit the same to AGM when requesting credit. These certificates indicate both the amount of the A/R loan requested and the amount of repayment on the Purchase Notes.

9. The Loan Agreement defines "Event of Default" as "[a]ny event described in Section 7.1 which has not been cured to the satisfaction of, or waived by, the Administrative Agent ...." Section 7.1 provides in pertinent part that an Event of Default includes "any representation or warranty made or deemed to have been made by or on behalf of the Borrower or Guarantors in any of the Loan Documents by or on behalf of the Borrower or Guarantors in any certificate, statement, report or other writing furnished by or on behalf of the Borrower to the Administrative Agent or any Lender pursuant to the Loan Documents [that proves] to have been false or misleading in any material respect on the date as of which the facts set forth are stated or certified or deemed to have been stated or certified."[2]

10. Section 7.2 of the Loan Agreement, entitled "Remedies", provides:

> If: (a) any Event of Default described in Sections 7.1(e), (f) or (g)[3] shall occur, the outstanding unpaid principle balance of the Notes, the accrued interest thereon and all other Obligations under the Loan Documents (including any Purchase Loan, Purchase Loan Interest, Reimbursement Obligation, LC Interest, A/R Loan, A/R Interest and any required Prepayment Fee) shall automatically become immediately due and payable; or (b) any other Event of Default shall occur and be continuing, then the Administrative Agent may take any or all of the following actions: (i) declare that the outstanding unpaid principle balance of any or all Notes, the accrued and unpaid interest thereon and all other Obligations (including any Reimbursement Obligations, LC Interest, Purchase Loans, Purchase Loan Interest, A/R Loans, A/R Interest and any required Prepayment Fee) under the Loan Documents to be forthwith due and payable, whereupon the Notes, all accrued and unpaid interest thereon and all such Obligations shall immediately become due and payable, in each case without demand or notice of any kind, all of which are hereby expressly waived, anything in this Agreement or in any Note to the contrary notwithstanding; (ii) impose additional interest at the Default Rate on all Obligations then outstanding; (iii) exercise all rights and remedies under any other instrument, document or agreement between the Borrower and Administrative Agent, Administrative Agent and/or any Lender; and (iv) enforce all rights and remedies under any applicable law.

---

[2] Section 7.1 provides a list of several other events the occurrence of which also constitute an Event of Default.
[3] Section 7.1(e) provides that the insolvency of Borrower or Guarantor, Borrower's general failure to pay its debts, and the appointment of a custodian, trustee or receiver of the Borrower or Guarantor constitute Events of Default. Section 7.1(f) provides that the institution of any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law by or against the Borrower or Guarantor constitutes an Event of Default. Section 7.1(g) provides that the institution of any dissolution or liquidation proceeding against Borrower or Guarantor constitutes an Event of Default.

11. Section 2.11 of the Loan Agreement provides:

<u>Early Termination; Prepayment Fee.</u> Notwithstanding the definition of "<u>Term</u>" contained in <u>Section 1.1</u> hereof, the Borrower may terminate the financing relationship evidenced hereby prior to the end of the Term if the Borrower: (a) provides not less than sixty (60) days prior written notice of such termination to the Administrative Agent, which notice shall not thereafter be revocable by the Borrower, (b) indefeasibly repays in full in cash any and all then outstanding Obligations and (c) pays the Agent, for the ratable benefit of the Lenders, as liquidated damages for the loss of bargain and not as a penalty (the "Prepayment Fee"), equal to the applicable amount set forth below:

| Date of Termination: | Prepayment Fee: |
|---|---|
| Prior to the first anniversary of this Agreement | $750,000 |
| On or after the first anniversary of this Agreement, but prior to the second Anniversary of this Agreement | $500,000 |
| On or after the second anniversary of this Agreement, but prior to the third Anniversary of this Agreement | $250,000 |

12. On or about February 10, 2006, by and through counsel, AGM sent a letter to Debtor giving notice of Events of Default, including, but not limited to, Debtor's making "false and/or misleading representations and warranties regarding the status of Eligible Inventory" in its Purchase Loan Requests and other documents submitted to AGM, which "materially adversely affected or impaired the value of [AGM's] interest in the Collateral." The letter indicated that AGM, pursuant to the Uniform Commercial Code, would privately sell all of the Debtor's existing right, title, share and interest in and to the Collateral sometime on or after March 1, 2006.

13. Because Debtor made false or misleading representations and warranties regarding the status of Eligible Inventory in its Purchase Loan Requests and other documents

4

submitted to AGM at the inception of the loan, Debtor was in default under the terms of the Loan Agreement effective as of June 22, 2005.

14. On April 12, 2006 (the "Filing Date"), three petitioning unsecured creditors filed an involuntary petition for relief against Debtor under chapter 7 of the Bankruptcy Code.

15. Debtor consented to entry of an order for chapter 7 relief and, on April 18, 2006, the Court entered an Order for Relief under Chapter 7. The Trustee was appointed as the chapter 7 trustee of Debtor's estate.

16. On April 24, 2006, AGM filed a Motion for Relief from the Automatic Stay and a Motion for an Expedited Hearing.

17. A hearing on the Motion for Relief from the Automatic Stay was held on April 28, 2006. The parties negotiated during a lengthy recess and agreed to consent to the order granting AGM relief from the automatic stay under specified conditions, which were read into the record by the Trustee. The parties all agreed that the goods needed to be promptly sold because the value of the goods was rapidly decreasing as a result of deterioration and the accrual of liens. The Court entered an oral ruling granting AGM relief from the automatic stay under the terms specified by the parties (the "Stay Relief Order").[4]

18. The Stay Relief Order provided that the § 362 automatic stay was terminated in order to permit AGM to exercise its rights and remedies under applicable nonbankruptcy law against the Collateral.

19. Pursuant to the Stay Relief Order, AGM agreed to deliver to Trustee all receipts of accounts receivable of Debtor which AGM had received on or after the Filing Date to be held in a separate, interest-bearing account until future order of the Court.

---

[4] A written order granting AGM relief from the automatic stay was entered on May 9, 2006, but stated that it was effective nunc pro tunc to the oral ruling delivered by the Court on April 28, 2006.

20.     In addition, AGM agreed to direct all further proceeds from the liquidation sales of its collateral to the Trustee to be held in the same account until future order of the Court.

21.     On April 28, 2006, AGM conducted a public auction pursuant to Article 9-610 of the Uniform Commercial Code (the "UCC Sale"). AGM was the successful bidder at the sale with its credit bid of $1 million.

22.     On May 26, 2006, and subsequently on July 6, 2006, AGM filed its first and second amended proofs of claim, respectively, asserting $5,619,301.85 as the amount of its claim as of the Filing Date.[5] In the rider to its second amended proof of claim, AGM asserts that its claim is calculated as follows:

| | |
|---|---|
| Principal: | $3,085,972.00 |
| Interest: | $1,387,803.00 |
| Professional fees: | $ 742,216.00 |
| Prepayment Premium: | $ 750,000.00 |
| Guarantor Collateral Proceeds | ($346,690.15) |
| **Total:** | **$5,619,301.85** |

23.     As of January 2, 2007, AGM has delivered approximately $4,356,849.00, derived from the Collateral, to the Trustee since the Filing Date, which the Trustee is holding in a segregated account. As previously agreed, the Trustee has reimbursed AGM $578,200.00 for costs incurred in the liquidation of the assets. The Trustee states that she has approximately $3,791,120.48 on hand from funds turned over by AGM.

## CONCLUSIONS OF LAW

The principal issue before the Court is the calculation of the allowed amount of AGM's claim.[6] AGM asserts that it is entitled to principal, interest at the default rate from June 22, 2005

---

[5] AGM's initial proof of claim was filed on April 26, 2006.
[6] AGM asserts the claim in its capacity as Administrative Agent for the lender, Lancelot. For ease of reference, the Court will refer to the claim as if it is simply AGM's claim.

to present, professional fees, and a prepayment premium. In addition, AGM asserts that it is entitled to receive all of the proceeds currently held by the Trustee from AGM's sale of the Collateral. The Trustee objects to AGM's calculation of its claim.[7] Specifically, the Trustee argues that AGM is not entitled to include the prepayment penalty, or the professional fees in its claim. The Trustee also asserts that any default interest awarded should be calculated from February 10, 2006 to present, and that the proceeds should remain in the estate until issues regarding priority and subordination are resolved by the Court.[8]

I. **Burden of Proof**

Under Fed. R. Bankr. P. 3001(f), a proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure shall constitute prima facie evidence of the validity and amount of the claim. "In the first stage of the claims objection process, courts defer to the 'probative force' of a creditor's proof of claim and any supporting documentation. This deference goes as far as to assume all findings of fact and conclusions of law that would be prerequisites to the creditor's recovery on the claim outside of bankruptcy -- even if those predicates are not recited on the face of the proof of claim." See In re Polymer Group, Inc., C/A No. 02-05773-W, slip op. at 4 (Bankr. D.S.C. May 21, 2003) (citations omitted).

As the challenger of AGM's claim, the burden shifts to the Trustee to introduce evidence to rebut the claim's presumptive validity. See In re Harford Sands, Inc., 372 F.3d 637, 640 (4th Cir. 2004) (citing Fed. R. Bankr. P. 9017; Fed. R. Evid. 301); see also In re Field, 226 B.R. 178, 182 (Bankr. D.S.C. 1998) ("The language of § 502(b) requires that this court allow the claims

---

[7] AGM entitled its motion as a "Motion for Allowance of Claim and to Compel Payment Thereof." A motion to allow a claim is unnecessary because the claim is deemed allowed under § 502(a) when filed unless a party in interest objects. Although the Trustee has not filed a formal objection to AGM's claim, her objection to the Motion for Allowance of Claim essentially serves the same function as an objection to claim and the Court will accordingly treat it as such.

[8] Although the Trustee has indicated to the Court many times that she intends to file claims against AGM for subordination, she has not done so for many months.

except to the extent that the objecting party establishes one of the enumerated bases for denial of the claims."). If the Trustee, as the objecting party, carries her burden, AGM has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence. See Harford Sands, Inc., 372 F.3d. at 640; In re Hoffman Associates, C/A No. 90-02419, slip op. at 6 (Bankr. D. S.C. Dec. 12, 1995) ("It is well established that in objecting to a claim against the Debtor, it is the burden of the objecting party to initially present sufficient evidence to overcome the prima facie presumption of validity enjoyed by a validly filed proof of claim. Having overcome the prima facie presumption, however, the burden of proof then shifts to the party submitting the claim to prove its claim.") (citing In re Allegheny Intern, Inc., 954 F.2d 167 (3d Cir. 1992)).

## II.  Calculation of AGM's Claim

### A.  Principal

AGM's second amended proof of claim, claiming that the principal balance due under the Loan Agreement is $3,085,972.00, was presumptively valid when filed.[9] The Trustee, however, introduced evidence that would reduce of AGM's claim for the principal owed on its claim. Specifically, the Trustee presented the testimony of Robert E. Faulkner, a certified public accountant, who testified that his calculation of the principal balance due was $2,828,591.00. Mr. Faulkner's calculation indicates that AGM overstated the amount of principal due by $257,381.00. This difference is due to the different methods by which AGM and the Trustee calculate the date a Purchase Loan converts into an A/R Loan. Mr. Faulkner testified that he based the conversion date on the dates indicated in the weekly borrowing base certificates provided to AGM by Debtor. The dates of repayment reflected in these certificates indicate a repayment date earlier than the dates indicated in AGM's internal accounting and would reduce

---

[9] The principal balance figure provided by AGM in its proof of claim includes regular interest.

8

AGM's claim for principle since the interest rate on a Purchase Loan was substantially higher than the interest rate on an A/R Loan. He further testified that AGM's calculations do not reconcile with the borrowing base certificates. Based on the testimony of Mr. Faulkner and the other evidence presented, the Court finds that the Trustee carried her burden of rebutting the presumptive validity of AGM's claim as to the principal balance.

Accordingly, the burden shifts to AGM to prove the amount and validity of its claim by a preponderance of the evidence. See Harford Sands, Inc., 372 F.3d at 640. AGM presented testimony of Gregory Bell, manager of AGM. Mr. Bell testified that the borrowing based certificates, documents submitted to AGM by Debtor, were not a reliable indicator of when a loan would be made to Debtor because, in the usual course of business between these parties, it often took several days for AGM to review and respond to Debtor's request for a loan or the certificates pre-dated the date that AGM would actually receive the certificates. Mr. Bell estimated that nearly half of the loan requests reflected in the borrowing based certificates could not be processed on the day the certificates were received because AGM often required additional information from Debtor. AGM calculated the conversion date based upon the date Debtor executed an A/R Note.

This method is consistent with the plain language of the Loan Agreement, which required the execution of an A/R Note prior to the conversion of a loan. The Trustee did not offer contrary convincing evidence from Debtor or another party with first hand knowledge of the accounting between Debtor and AGM and therefore the Court finds that AGM has carried the burden of persuasion on the issue of principal and that AGM properly calculated its claim for principal due on its claim. Accordingly, the Court recognizes AGM's request for principal in the amount of $3,085,972.00.

**B.     Default Interest**

AGM requests prepetition interest at the default rate from June 22, 2005 through the Filing Date. AGM claims that Debtor made fraudulent misrepresentations in the documents presented at the origination of the financing transaction regarding the status of eligible inventory, thus Debtor was in default under the terms of the Loan Agreement from the inception of the loan. The Trustee does not dispute that the contractual provision providing for an increased interest rate upon default is enforceable under Illinois law, but asserts that the default rate of interest is excessive and that any default interest awarded should be awarded from February 10, 2006, the date the notice of default was sent to Debtor.

Generally speaking, default interest compensates the lender for the increased costs and risks attendant to defaulted loans. Prepetition default interest may be properly awarded pursuant to the terms of the parties' contract if default occurs prior to the debtor's bankruptcy filing. See § 502(b).[10] When deciding the allowed amount of a prepetition claim based on a contract, the Court typically will be deferential to the terms negotiated by the parties in their contract.[11] See In re River East Plaza, L.L.C., No. 03-C-4354, slip op., 2006 WL 2787483 (N.D.Ill. 2006) )("A court should not generally rewrite a contract and should only do so where clear and convincing evidence exists that properly reflects the true intent of the parties.") This is especially true where the parties are sophisticated business entities and there is no pervasive evidence of overreaching. In re Woodmere Investors, Ltd., 178 B.R.346, 355 (Bankr. S.D.N.Y. 1995). The Court will

---

[10] If a debtor defaults prior to the petition date, default interest is properly included in the creditor's claim because the creditor's right to collect default interest matured at the time of default.

[11] This is not the case when a court is analyzing an oversecured creditor's claim for post petition fees, costs, or charges provided for under the agreement. In this situation, the court will make a determination regarding whether the post petition fees, costs, or charges are reasonable under § 506(b). At this time, AGM is only requesting prepetition interest, fees, costs, and charges, but reserves its rights to assert these postpetition claims at a later date.

presume that every clause in a contract was inserted deliberately and for a purpose. <u>Atlantic Mut. Ins. Co. v. Metron Eng'g & Constr. Co.</u>, 83 F.3d 897, 900 (7th Cir. 1996).

Based on the evidence presented, the Court finds that Debtor and AGM contracted for default interest. Section 7.2 specifically provides for a default rate of interest to apply upon the occurrence of an Event of Default. Under section 7.1, an Event of Default includes any representation made by Debtor in any of the Loan Documents that proves to have been false or misleading in any material respect *"on the date as of which the facts set forth are stated or certified or deemed to have been stated or certified."* AGM's witness, Gregory Bell, testified that AGM discovered, through the later admissions of Debtor's officers, that Debtor had made misrepresentations regarding the status of Eligible Inventory in its Purchase Loan Requests and other documents submitted to AGM. The Trustee failed to identify a provision of the agreement that convinces the Court that default interest should be calculated from a date other than June 22, 2005, the date on which AGM asserts the Event of Default occurred. Accordingly, the Court finds that the Trustee has failed to present sufficient evidence overcoming the presumptive validity of AGM's claim as to default interest.

C.   **Professional Fees**

Section 502(b) provides that the amount of a creditor's claim is determined as of the date of the filing of the petition. The amount of the creditor's claim includes the principal amount of the obligation plus all matured prepetition interest, fees, costs, and charges owing as of the petition date. <u>In re Vanderveer Estates Holdings, Inc.</u>, 283 B.R. 122, 355 (Bankr. E.D.N.Y. 2002). Accordingly, AGM is entitled to receive reimbursement for pre-petition professional fees, so long as the contract provides this right to AGM and the provision for professional fees is enforceable under state law. <u>See id.</u> Under Section 9.2(a) of the Loan Agreement, Debtor agrees

to pay and reimburse AGM upon demand for all expenses paid or incurred by AGM and the Lenders (including fees and expenses of legal counsel) in connection with the collection and enforcement of the Loan Documents. The Trustee has not objected to AGM's claim for professional fees on the ground that the contract provision is invalid under state law. The Trustee instead argues that the Court should not award professional fees to AGM because the invoices for the professional services were directed towards and paid by Lancelot, the Lender, rather than AGM.

Fed. R. Bankr. P. 3001 allows claims to be made by a creditor or an authorized agent of a creditor. AGM presented evidence that, under the terms of the Loan Documents, AGM was the Administrative Agent of the lender, Lancelot, and was authorized to make a claim on Lancelot's behalf. AGM also presented testimony that Lancelot is the parent company of AGM and that all invoices for professional fees, including the invoices directed to AGM, were paid out of the same account by the same individual. Further, Section 9.2 of the Loan Agreement indicates that Debtor agrees to reimburse AGM for expenses paid by the lender, Lancelot.

AGM entered invoices into evidence to support its claim for professional fees. The Trustee also argues that the invoices presented by AGM in support of its claim for professional fees were insufficiently detailed, and therefore, AGM failed to provide justification for the amount of professional fees it seeks. The Trustee did not present evidence or testimony that convinced the Court that these invoices were insufficiently detailed or invalid. Therefore, the Court finds that the Trustee has failed to present sufficient evidence to overcome the presumption that AGM's claim for professional fees is valid.

### D. Prepayment Premium

AGM asserts that it is entitled to receive $750,000.00 as a prepayment fee under the terms of the Loan Agreement. AGM argues that the prepayment fee is due upon the occurrence of an Event of Default.[12] The Trustee disputes that the terms of the Loan Agreement provide for a prepayment fee upon the occurrence of an Event of Default. She argues that, under the plain language of the Loan Agreement, the prepayment fee would only apply if Debtor had terminated the financing relationship by providing at least 60 days written notice of termination and tendering payment in full to AGM. Because those circumstances did not occur, the Trustee asserts that AGM is not entitled to receive a prepayment fee.

Prepayment fees insure a lender against the loss of its bargain if interest rates decline and the borrower chooses to refinance. As a general rule, reasonable prepayment fees are enforceable. In re AE Hotel Venture, 321 B.R. 209, 219 (Bankr. N.D.Ill. 2005). However, one of the limitations on the right to receive a prepayment fee is that a lender loses its right to a prepayment fee when it elects to accelerate the debt. Slevin Container Corp. v. Provident Fed. Sav. & Loan Ass'n, 424 N.E.2d 939, 940-41 (Ill. Ct.App. 1981); see also In re AE Hotel Venture, 321 B.R. at 218.[13] A lender can avoid the usual effect of acceleration on the enforceability of the prepayment fee by including an appropriate contractual provision that specifically provides for the lender's right to collect a prepayment fee in the event of default and acceleration. In re AE Hotel Venture, 321 B.R. at 218.

---

[12] Section 7.2 provides, in pertinent part, that if any Event of Default shall occur, the outstanding unpaid principle balance of the Notes, the accrued interest thereon and *all other Obligations* under the Loan Documents (including any Purchase Loan, Purchase Loan Interest, Reimbursement Obligation, LC Interest, A/R Loan, A/R Interest and *any required Prepayment Fee*) shall automatically become immediately due and payable. AGM argues that the inclusion of the term "Obligations" within Section 7.2 of the Loan Agreement means that an "Event of Default" triggers the application of a Prepayment Fee, because "Obligations" is defined as including any Prepayment Fee arising under the terms of the Loan Agreement.

[13] The rationale is that the acceleration of the loan advances the maturity date of the debt so that payment thereafter is not prepayment, but rather payment made after maturity. In re AE Hotel Venture, 321 B.R. at 218.

13

AGM argues that the inclusion of the term "Obligations" within Section 7.2 of the Loan Agreement means that an "Event of Default" triggers the application of a Prepayment Fee, because "Obligations" is defined as including "any Prepayment Fee arising under the terms of the Loan Agreement." The Court is not persuaded that the inclusion of the term "Obligations" within Section 7.2 is sufficient to overcome the usual effect of acceleration in this case.[14] The Court finds that AGM has failed to prove by a preponderance of the evidence that the Loan Agreement gives AGM the right to collect a prepayment fee following the occurrence of an "Event of Default."

Accordingly, the Court finds that the Trustee has presented sufficient evidence to overcome the presumptive validity of AGM's claim for a prepayment fee and AGM's request for a prepayment fee should be denied.

### III.  AGM's Entitlement to Proceeds

Perhaps the unanticipated twist to the disposition of the proceeds held by the Trustee is AGM's rights as a buyer of the collateral it purchased. Prior to the petition date, AGM noticed a sale of Debtor's assets pursuant to the Illinois Commercial Code. At the hearing on AGM's stay relief motion, AGM stated that it was proceeding with the sale of the collateral on the very afternoon that it was granted stay relief. Neither the Trustee, Debtor, nor any other party present at the hearing objected to the sale of AGM's collateral despite being asked by the Court if there were objections to proceeding with sale. A public sale of AGM's collateral was conducted on April 28, 2006. The collateral was sold for one million dollars to AGM.[15] See 810 Ill. Comp.

---

[14] At best, the reference to "any Prepayment Fee arising under the Agreement" within the definition of "Obligations" makes the contract ambiguous. A contract is ambiguous is if it is subject to more than one reasonable interpretation. See ICEBU v. Hyster-Yale Materials Handling, Inc., 83 F.3d 930, 933 (7th Cir. 1996).

[15] The Trustee has not formally challenged the notice of the sale, whether the sale was commercially reasonable, whether AGM is entitled to a deficiency after the sale, or otherwise sought to set aside the sale

14

Stat. 5/9-610(c) (2001) (providing that a secured party may purchase its collateral at a public sale).

Once sold to AGM, Debtor and the estate lost any rights to the collateral. See 810 Ill. Comp. Stat. 5/9-617 (2001) (stating that the transferee of the sold collateral acquires all of the debtor's rights in the collateral and thus is entitled to the proceeds of the sale). AGM subsequently escrowed approximately 4.3 million dollars with the Trustee, representing proceeds of the subsequent sale of the property and collection of account receivables. At that point in time, AGM was the owner of the proceeds and the estate's rights had been terminated by the UCC sale.[16] The Court need only find that AGM's pre-petition claim equals one million dollars in order for AGM to be entitled to receive all of the proceeds from the post-UCC sale, with one million dollars of these funds representing AGM's secured claim and the remainder being property of AGM. See Boender v. Chicago North Clubhouse Ass'n, Inc., 608 N.E.2d 207, 214 (Ill. App. Ct. 1992) (rejecting a debtor's argument that a secured creditor who purchases the debtor's collateral at a sale is required to account to the debtor for the surplus proceeds realized when the collateral is subsequently disposed of by the creditor); Wachovia Bank & Trust Co. v. McCoy, 270 S.E.2d 164 (W.Va. 1980) (construing the UCC and finding that when a secured party purchases the debtor's collateral at a sale, then it acquires the rights of the debtor in the collateral). Both the Trustee and AGM agree that AGM's pre-petition claim exceeds one million dollars.

The Trustee holds in a segregated account funds turned over by AGM in the amount of $3,791,120.48, which is comprised of either post-UCC sale proceeds or funds received from

---

to AGM. Though the Trustee mentioned the lack of notice at the hearing on the Motion, she has not formally moved to invalidate the sale for lack of notice.

[16] Both the Trustee and AGM agree that AGM's pre-petition claim exceeds one million dollars.

accounts receivables.[17] All of these funds represent either proceeds of property owned and sold by AGM or property of the estate which is fully encumbered by AGM's security interest. Accordingly, AGM is entitled to receive all of the funds held by the Trustee in the subject segregated account.

For the foregoing reasons it is hereby

ORDERED that the Motion of AGM II LLC for Allowance of Claim and to Compel Payment Thereof is granted in part and denied in part. The request for principal in the amount of $3,085,972.00 is granted. The request for default interest in the amount of $1,387,803.00 is granted. The request for professional fees in the amount of $739,376.00 is granted.[18] The request for the prepayment penalty is denied. AGM's claim is allowed in the total amount of $3,866,460.85;[19] and

While the Trustee has alluded to subordination actions she intends to file in this Court, none have been filed at this time. In view of the considerable time the funds have been held by the Trustee and the harm to AGM caused by delay in payment, the Court will not delay distribution based merely upon the Trustee's request. Accordingly, it is

---

[17] These accounts receivables would be comprised of accounts receivables collected by AGM prior to the UCC Sale, which would be property of the estate but subject to AGM's secured claim, and accounts receivables collected by AGM after the UCC Sale, which, as proceeds of assets purchased at the UCC Sale, would be property of AGM. The Court does not have sufficient information before it to make a determination of the exact amount of funds received by AGM from accounts receivable prior to the UCC Sale.

[18] AGM agreed at the hearing to reduce its claim for professional fees by $2,840.00.

[19] AGM's claim has been reduced from $5,213,151 to $3,866,460.85 as a result of AGM's collection of Non-Debtor Guarantor Collateral Proceeds in the amount of $346,690.15 and the $1 million credit bid at the UCC Sale and shall be further reduced to the extent that the funds held in the segregated account constitute accounts receivables collected by AGM prior to the date of the UCC Sale.

FURTHER ORDERED that the Trustee shall turnover to AGM all of the funds AGM escrowed with the Trustee, plus any accrued interest, within 10 days of the entry of this Order.

AND IT IS SO ORDERED.

_____
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
February 12, 2007