ENTERED
SEP 30 2009
K.R.W.

FILED
__ o'clock & __ min __ M
SEP 3 0 2009
United States Bankruptcy Court
Columbia, South Carolina (25)

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 06-01499-JW |
| | Chapter 7 |
| Worldwide Wholesale Lumber, Inc., | ORDER |
| Debtor(s). | |

This matter comes before the Court upon the Trustee's objection ("Objection") to the claim of Michael Popovich on the basis the claim requests termination benefits that he is not entitled to receive. Popovich filed a timely response ("Response") opposing the Trustee's Objection. After considering the evidence presented by Popovich[1] and the Trustee at the hearing, the Court makes the following Findings of Fact and Conclusions of Law.[2]

Findings of Fact

1. On April 12, 2006, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Worldwide Wholesale Lumber, Inc., d/b/a Veracor Wood Products International ("Debtor").

2. Popovich, a former employee of Debtor, filed Proof of Claim Number 27 on July 21, 2006, in the amount of $29,250. Popovich listed the entire amount as an unsecured priority claim based on wages, contributions to an employee benefit plan, and vacation pay pursuant to an employee contract.[3] It is undisputed that Popovich was employed by Debtor pre-petition from

---

[1] Popovich appeared pro se at the hearing on the Trustee's Objection. At the hearing, the Court was mindful that Popovich was a pro se litigant, provided him some deference, and treated his presentation to the Court as testimony.

[2] To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

[3] At the hearing, however, the Trustee and Popovich agreed that if the claim was allowed, the priority status was subject to a statutory limitation of $10,950, and the remainder would be a general unsecured claim. See 11 U.S.C. § 507(a)(4)(A) (providing that an allowed unsecured claim for "wages, salaries, or commissions, including

January 10, 2006, to March 14, 2006.

3. Popovich attached to his proof of claim an email transmission from Russell Stadelman II, CEO of Debtor, dated January 7, 2006, and signed by Stadelman, which outlined the terms of Popovich's employment with Debtor.[4] The email provided Popovich's starting date would be January 10, 2006, with a base salary of $15,000 per month for the first nine (9) months of employment. Popovich's base salary would be reduced to $12,333.33 per month with a monthly payout bonus structure beginning on October 1, 2006. The email further stated, "There are to be 3 paid weeks vacation." Additionally, the email provided for a car allowance of $250 per pay period, a matching contribution into the company's 401k program, and full payment of the company health and dental insurance plan. The email also provided a paragraph entitled, "TERMINATION OF EMPLOYMENT," which stated, "If we terminated you from the company without just cause, you will be provided 1 month's salary and 3 months benefits paid within 30 days of your last day."

4. At the conclusion of the email, Popovich provided the following handwritten computation of his claim:

> 1 month salary - $15,000
> 3 weeks vacation pay - $11,250
> 3 months benefits coverage - $3,000
> Total - $29,250

5. The Trustee filed the Objection on July 24, 2009, and stated the following:

> Claimant is requesting termination benefits that he is not entitled to receive. Claimant continued his employment with the secured lender post petition. Claim should be disallowed[.]

---

vacation, severance, and sick leave pay" earned within 180 days of the commencement of the case is entitled to priority status to the extent of $10,950).

[4] This document was admitted into evidence at the hearing.

2

At the hearing, the Trustee primarily argued that Popovich was not entitled to compensation under the termination policy provided in the email because he voluntarily resigned.

6. The Trustee also stated at the hearing that at the time Popovich left his employment, Debtor was working on a refinance package and officers of Debtor asked Popovich to continue working because of the importance of the pending refinance. The Trustee noted that after Popovich refused to continue his employment, the refinance package failed, and the involuntary bankruptcy case was commenced.

7. In his Response, Popovich stated that between May 18, 2006, and November 7, 2006, he worked post-petition for Mark Kaplan, who he described as "a contractor working on behalf of [Debtor's] lender." Popovich stated he was hired as an independent contractor "to provide coordination and support services in the sale of hardwood plywood goods." At the hearing, Popovich further explained that after the bankruptcy case was commenced, he assisted Kaplan with the liquidation of Debtor's assets.

8. Popovich also alleged in his Response that he left his employment with Debtor on March 14, 2006, "because he was concerned with unethical and possibly criminal practices that would have required his cooperation." Popovich stated he "raised his concerns without responsive action and there appeared no likelihood that the activities were going to stop," and thus, he had "no alternative but to resign or be implicated in possible illegal actions."

9. At the hearing, Popovich reiterated he left his employment because he felt he had no other choice; he claimed Stadelman instructed him to perform illegal activities and he refused to complete those duties. Specifically, Popovich stated that Stadelman asked him "behind closed doors," and in contradiction to the instructions provided by the lender, to change the labeling of

3

products to be shipped to customers pursuant to purchase order contracts. Popovich claimed he refused to comply and he confronted Stadelman several times, but Stadelman continued to instruct him to make the labeling changes.

10. Popovich did not dispute the Trustee's contention that Stadelman never threatened to fire him. Popovich stated he informed Stadelman he was removing himself from the work environment, but he never used the word "resign," and he never issued a writing stating that he resigned or otherwise quit. Furthermore, it was not disputed at the hearing that Stadelman asked Popovich to stay and made promises to Popovich that he would not make any requests which Popovich deemed to be improper in the future. The Trustee asserted this stipulation clearly demonstrated Popovich was not terminated; however, Popovich maintained Stadelman had no credibility since he had made such promises repeatedly in the past and failed to live up to them.

11. The Trustee acknowledged the working environment must have been stressful for Popovich, but disputed his contention that he was instructed to perform illegal activities. Specifically, the Trustee noted the example given to her by Popovich was that a customer ordered maple wood of a certain grade, that wood was not available, and Stadelman instructed Popovich to ship maple of a different grade. The Trustee argued that under the Uniform Commercial Code ("UCC"), the shipment of substitute goods was permissible, and the recipient could choose to return the nonconforming goods.

12. At the hearing, the Court also admitted into evidence an email that Popovich sent to Stadelman after he left his employment. The email states, in pertinent part:

> I wish you the best of luck to you in your professional-business career going forward. I hope your dreams come true. It's unfortunate that my comfort level in making new commitments to secure a new loan couldn't be

4

compromised.[5]

13. The parties also disputed the amount Popovich claimed for vacation leave. The Trustee argued Popovich could claim only one-sixth (1/6) of the three-week vacation pay because he was employed by Debtor for two months. Popovich claimed the vacation leave was available immediately, thus entitling him to reimbursement for the full amount of the leave.

14. In his Response, Popovich supported his claim for $3,000 for benefits by attaching a table of 2006 COBRA rates, on which he circled the selection of "Employee + 2 or more Dependents" and the corresponding rate of $1042.13. Below the table, Popovich included a handwritten computation: "$1042 x 3 months cost = $3126 total." The Trustee did not raise any specific objections in the Objection or at the hearing with respect to Popovich's computation of benefits.

15. The Trustee estimated there will be some funds to pay priority claims, and the probability of an unsecured claim receiving payment is unknown.

## Conclusions of Law

A creditor's claim is deemed allowed if a timely proof of claim is filed unless a party in interest objects to the claim. 11 U.S.C. § 502(a).[6] If an objection to claim is made, the court must determine the amount of the claim and allow the claim unless there is a prescribed ground for disallowing the claim. § 502(b). A proof of claim executed and filed in accordance with the Rules is "prima facie evidence of the validity and amount of the claim." Rule 3001(f). Consequently, the party objecting to a claim is given the burden of presenting evidence to

---

[5] Popovich also requested the Court to consider the April 2006 decision of the Appeal Tribunal of the South Carolina Employment Security Commission regarding Debtor's former chief financial officer's ("CFO") application for workers' compensation benefits. The Court agrees with the Trustee that the decision is not relevant for purposes of this Order because there is no indication the circumstances surrounding the CFO's departure from employment with Debtor were similar to those of Popovich.

[6] Further reference to the Bankruptcy Code, 11 U.S.C. § 101 et seq., will be by section number only. Reference to the Federal Rules of Bankruptcy Procedure will be by rule number only.

5

overcome the prima facie presumption of validity. In re Hinton, C/A No. 06-05584-JW, slip op. (Bankr. D.S.C. Sept. 11, 2007) (citing In re Ford, C/A No. 05-44958-JW, slip op. at 3 (Bankr. D.S.C. Mar. 10, 2006)).

First, the Court notes the determination of Popovich's claim for vacation leave is not dependent on the applicability of the termination policy and finds Popovich is entitled to an amount worth one-sixth (1/6) of his vacation leave, or $1,875. The Trustee sufficiently rebutted the presumption of validity initially accorded to the claim for vacation leave with the argument that Debtor was only employed by Debtor for approximately two months, and there is no indication from the employment agreement that the vacation leave was intended to be available in its entirety immediately upon Popovich's commencement of work. Popovich failed to present any evidence to the contrary.[7] Thus, the Court concludes Popovich is entitled to reimbursement for the amount of vacation leave in proportion to his two months of work for Debtor.

The threshold issue to determine with respect to the remaining portion of the claim is if Popovich has the benefit of the termination policy. It is undisputed that Popovich was neither fired nor threatened with termination. Rather, Popovich asserts he was forced to leave his employment with Debtor because of the conditions of his employment.

"Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Scott v. Ameritex Yarn, 72 F. Supp. 2d 587, 594 (D.S.C. 1999) (citing Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 244 (4th Cir. 1997)). Thus, Popovich must first show "intolerability," which is determined

---

[7] At the hearing, Popovich's only argument to support his claim for the full amount of vacation leave was based on the language of the vacation policy: "There are to be 3 paid weeks vacation." The only reasonable inference is that Popovich was entitled to three weeks of paid vacation per year. Popovich's assertion – that he could use all three weeks of vacation immediately upon starting his employment with Debtor – is equally as unreasonable as interpreting the language to mean Popovich was entitled to a total of three weeks of vacation for the duration of his employment with Debtor, regardless of how many years he worked.

6

by whether "a reasonable person in the employee's position would have felt compelled to resign." Mozingo v. S. Fin. Group, Inc., 520 F. Supp. 2d 733, 741 (D.S.C. 2007) (citing Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)).

Second, Popovich must show "deliberateness," which requires proof that "the actions complained of were intended by the employer as an effort to force the employee to quit." Mozingo, 520 F. Supp. 2d at 741 (citing Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1354 (4th Cir. 1995)). However, it is sufficient for Popovich to prove the second element by showing the resignation was the "reasonably foreseeable consequence of the employer's conduct." Mozingo, 520 F. Supp. 2d at 741 (citing Martin, 48 F.3d at 1356). An employee's "failure to seek redress" from the employer prior to resignation may also bar a claim for constructive discharge. Scott, 72 F. Supp. 2d at 595.

The Court concludes the Trustee sufficiently rebutted the presumption of validity given to Popovich's claim under the termination policy, and Popovich failed to show he was constructively discharged. The Court finds no evidence that a reasonable person in Popovich's position would have felt compelled to resign or that the resignation was the reasonably foreseeable consequence of the employer's conduct.

In his pleadings and at the hearing, Popovich only vaguely described the work activities and instructions from Stadelman that gave rise to his belief that he had no other option but to leave his employment. The only specific example given was the Trustee's explanation that Stadelman asked Popovich to ship maple of a different grade when the ordered grade was not available. Popovich made no indication that this example was inaccurate or understated, and the Trustee correctly noted that the UCC provides guidance and remedies for such circumstances. Furthermore, Popovich conceded Stadelman asked him to continue his employment with Debtor

and that Stadelman made assurances he would not make similar requests of Popovich in the future. Despite the deference accorded to him as a pro se litigant, Popovich is still required to meet his burden of proof. The Court cannot find that Popovich has demonstrated the "intolerability" or "deliberateness" elements of constructive discharge based on the vague circumstances described at the hearing. As a result, Popovich is not entitled to a claim for one month's salary and three months' benefits pursuant to the termination policy.[8]

Accordingly, Popovich's claim is allowed as an unsecured, priority claim to the extent of $1,875. On the basis that Popovich failed to establish his claim under the termination policy, the remaining portion of the claim is disallowed.

**AND IT IS SO ORDERED.**

_____
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
September 30, 2009

---

[8] In light of the Court's finding that the termination policy is not applicable, there is no need to assess the effect of Popovich's subsequent employment with Kaplan.